(Slip Opinion)        OCTOBER  TERM,  2009        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MAC'S SHELL SERVICE, INC., ET AL. *v.* SHELL OIL PRODUCTS CO. LLC ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 08–240.   Argued January 19, 2010—Decided March 2, 2010*

The Petroleum Marketing Practices Act (Act) limits the circumstances in which franchisors may "terminate" a service-station franchise or "fail to renew" a franchise relationship.  15 U. S. C. §§2802, 2804. Typically, the franchisor leases the service station to the franchisee and permits the franchisee to use the franchisor's trademark and purchase the franchisor's fuel for resale.  §2801(1).  As relevant here, service-station franchisees (dealers) filed suit under the Act, alleging that a petroleum franchisor and its assignee had constructively "terminate[d]" their franchises and constructively "fail[ed] to renew" their franchise relationships by substantially changing the rental terms that the dealers had enjoyed for years, increasing costs for many of them.  The dealers asserted these claims even though they had not been compelled to abandon their franchises, and even though they had been offered and had accepted renewal agreements.  The jury found against the franchisor and assignee, and the District Court denied their requests for judgment as a matter of law.  The First Circuit affirmed as to the constructive termination claims, holding that the Act does not require a franchisee to abandon its franchise to recover for such termination, and concluding that a simple breach of contract by an assignee of a franchise agreement can amount to constructive termination if the breach resulted in a material change effectively ending the lease.  However, the court reversed as to the constructive nonrenewal claims, holding that such a claim cannot be maintained once a franchisee signs and operates under a

——————

*Together with No. 08–372, *Shell Oil Products Co. LLC et al.* v. *Mac's Shell Service, Inc., et al.,* also on certiorari to the same court.

renewal agreement.

*Held:*

  1. A franchisee cannot recover for constructive termination under the Act if the franchisor's allegedly wrongful conduct did not compel the franchisee to abandon its franchise. Pp. 6–15.

    (a) The Act provides that "no franchisor . . . may . . . terminate any franchise," except for an enumerated reason and after giving written notice, §2802(a)–(b), and specifies that "'termination' includes cancellation," §2801(17). Because it does not further define those terms, they are given their ordinary meanings: "put [to] an end" or "annul[ed] or destroy[ed]." Thus, the Act prohibits only franchisor conduct that has the effect of ending a franchise. The same conclusion follows even if Congress used "terminate" and "cancel" in their technical, rather than ordinary, senses. This conclusion is also consistent with the general understanding of the constructive termination doctrine as applied in analogous legal contexts—*e.g.,* employment law, see *Pennsylvania State Police* v. *Suders,* 542 U. S. 129, 141–143—where a termination is deemed "constructive" only because the plaintiff, not the defendant, formally ends a particular legal relationship—not because there is no end to the relationship at all. Allowing franchisees to obtain relief for conduct that does not force a franchise to end would ignore the Act's scope, which is limited to the circumstances in which franchisors may terminate a franchise or decline to renew a franchise relationship and leaves undisturbed state-law regulation of other types of disputes between petroleum franchisors and franchisees, see §2806(a). This conclusion is also informed by important practical considerations, namely, that any standard for identifying those breaches of contract that should be treated as effectively ending a franchise, even though the franchisee continues to operate, would be indeterminate and unworkable. Pp. 6–12.

    (b) The dealers' claim that this interpretation of the Act fails to provide franchisees with protection from unfair and coercive franchisor conduct that does not force an end to the franchise ignores the availability of state-law remedies to address such wrongful conduct. The Court's reading of the Act is also faithful to the statutory interpretation principle that statutes should be construed "in a manner that gives effect to all of their provisions," *United States ex rel. Eisenstein* v. *City of New York,* 556 U. S. \_\_\_, \_\_\_, because this interpretation gives meaningful effect to the Act's preliminary injunction provisions and its alternative statute-of-limitations accrual dates. Pp. 12–14.

  2. A franchisee who signs and operates under a renewal agreement with a franchisor may not maintain a constructive nonrenewal claim under the Act. The Act's text leaves no room for such an interpreta-

tion.  It is violated only when a franchisor "fail[s] to renew" a franchise relationship for an enumerated reason or fails to provide the required notice, see §2802, and it defines "fail to renew" as a "failure to reinstate, continue, or extend the franchise relationship," §2801(14).  A franchisee that signs a renewal agreement cannot carry the threshold burden of showing a "nonrenewal of the franchise relationship," §2805(c), and thus necessarily cannot establish that the franchisor has violated the Act.  Signing their renewal agreements "under protest" did not preserve the dealers' ability to assert nonrenewal claims.  When a franchisee signs a renewal agreement—even "under protest"—there has been no "fail[ure] to renew," and thus no violation of the Act.  The Act's structure and purpose confirm this interpretation.  Accepting the dealers' contrary reading would greatly expand the Act's reach.  Pp. 15–19.

524 F. 3d 33, reversed in part, affirmed in part, and remanded.

  ALITO, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――――

Nos. 08–240 and 08–372

―――――――

MAC'S SHELL SERVICE, INC., ET AL., PETITIONERS
08–240                          *v.*
SHELL OIL PRODUCTS COMPANY LLC, ET AL.


SHELL OIL PRODUCTS COMPANY LLC, ET AL.,
PETITIONERS
08–372                          *v.*
MAC'S SHELL SERVICE, INC., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[March 2, 2010]

JUSTICE ALITO delivered the opinion of the Court.

The Petroleum Marketing Practices Act (PMPA or Act),
92 Stat. 322, 15 U. S. C. §2801 *et seq*., limits the circum-
stances in which petroleum franchisors may "terminate" a
franchise or "fail to renew" a franchise relationship.
§2802. In these consolidated cases, service-station fran-
chisees brought suit under the Act, alleging that a fran-
chisor had constructively "terminate[d]" their franchises
and had constructively "fail[ed] to renew" their franchise
relationships. They asserted these claims even though the
conduct of which they complained had not compelled any
of them to abandon their franchises and even though they
had been offered and had accepted renewal agreements.
We hold that a franchisee cannot recover for constructive
termination under the PMPA if the franchisor's allegedly

wrongful conduct did not compel the franchisee to abandon its franchise. Additionally, we conclude that a franchisee who signs and operates under a renewal agreement with a franchisor may not maintain a claim for constructive nonrenewal. We therefore reverse in part and affirm in part.

I

A

Petroleum refiners and distributors supply motor fuel to the public through service stations that often are operated by independent franchisees. In the typical franchise arrangement, the franchisor leases the service-station premises to the franchisee, grants the franchisee the right to use the franchisor's trademark, and agrees to sell motor fuel to the franchisee for resale. Franchise agreements remain in effect for a stated term, after which the parties can opt to renew the franchise relationship by executing a new agreement.

Enacted in 1978, the PMPA was a response to widespread concern over increasing numbers of allegedly unfair franchise terminations and nonrenewals in the petroleum industry. See, *e.g.*, Comment, 1980 Duke L. J. 522, 524–531. The Act establishes minimum federal standards governing the termination and nonrenewal of petroleum franchises. Under the Act's operative provisions, a franchisor may "terminate" a "franchise" during the term stated in the franchise agreement and may "fail to renew" a "franchise relationship" at the conclusion of that term only if the franchisor provides written notice and takes the action in question for a reason specifically recognized in the statute. 15 U. S. C. §§2802, 2804. Consistent with the typical franchise arrangement, a "franchise" is defined as "any contract" that authorizes a franchisee to use the franchisor's trademark, as well as any associated agreement providing for the supply of motor fuel or authorizing

the franchisee to occupy a service station owned by the franchisor.[1] §2801(1). The Act defines a "franchise relationship" in more general terms: the parties' "respective motor fuel marketing or distribution obligations and responsibilities" that result from the franchise arrangement. §2801(2).

To enforce these provisions, a franchisee may bring suit in federal court against any franchisor that fails to comply with the Act's restrictions on terminations and nonrenewals. See §2805. Successful franchisees can benefit from a wide range of remedies, including compensatory and punitive damages, reasonable attorney's fees and expert costs, and equitable relief. See §2805(b), (d). The Act also requires district courts to grant preliminary injunctive relief to aggrieved franchisees, if there are "sufficiently serious questions going to the merits" that present "a fair ground for litigation" and the balance of hardships favors such relief. §2805(b)(2).

## B

This litigation involves a dispute between Shell Oil Company (Shell), a petroleum franchisor, and several Shell franchisees in Massachusetts.[2] Pursuant to their franchise agreements with Shell, each franchisee was required to pay Shell monthly rent for use of the service-station premises. For many years, Shell offered the franchisees a rent subsidy that reduced the monthly rent by a set amount for every gallon of motor fuel a franchisee sold above a specified threshold. Shell renewed the subsidy annually through notices that "explicitly provided for

---

[1] Courts sometimes describe these three types of agreements as the "statutory elements" of a petroleum franchise. See, *e.g.*, *Marcoux* v. *Shell Oil Prods. Co.*, 524 F. 3d 33, 37, n. 1 (CA1 2008).

[2] Shell Oil Products Company LLC, another party in this litigation, is a wholly owned subsidiary of Shell Oil Company. See Brief for Petitioners in No. 08–372, p. iii.

cancellation [of the rent subsidy] with thirty days' notice." *Marcoux* v. *Shell Oil Prods. Co.*, 524 F. 3d 33, 38 (CA1 2008). Nonetheless, Shell representatives made various oral representations to the franchisees "that the [s]ubsidy or something like it would always exist." *Ibid.*

In 1998, Shell joined with two other oil companies to create Motiva Enterprises LLC (Motiva), a joint venture that combined the companies' petroleum-marketing operations in the eastern United States. *Id.*, at 37. Shell assigned to Motiva its rights and obligations under the relevant franchise agreements. Motiva, in turn, took two actions that led to this lawsuit. First, effective January 1, 2000, Motiva ended the volume-based rent subsidy, thus increasing the franchisees' rent. *Id.*, at 38. Second, as each franchise agreement expired, Motiva offered the franchisees new agreements that contained a different formula for calculating rent. For some (but not all) of the franchisees, annual rent was greater under the new formula.

C

In July 2001, 63 Shell franchisees (hereinafter dealers) filed suit against Shell and Motiva in Federal District Court. Their complaint alleged that Motiva's discontinuation of the rent subsidy constituted a breach of contract under state law. Additionally, the dealers asserted two claims under the PMPA. First, they maintained that Shell and Motiva, by eliminating the rent subsidy, had "constructively terminated" their franchises in violation of the Act. Second, they claimed that Motiva's offer of new franchise agreements that calculated rent using a different formula amounted to a "constructive nonrenewal" of their franchise relationships.[3]

––––––––––

[3] The dealers also claimed that Shell and Motiva had violated the Uniform Commercial Code, as adopted in Massachusetts, by setting unreasonable prices under the open-price terms of their fuel-supply

Opinion of the Court

After a 2-week trial involving eight of the dealers, the jury found against Shell and Motiva on all claims. Both before and after the jury's verdict, Shell and Motiva moved for judgment as a matter of law on the dealers' two PMPA claims. They argued that they could not be found liable for constructive termination under the Act because none of the dealers had abandoned their franchises in response to Motiva's elimination of the rent subsidy—something Shell and Motiva said was a necessary element of any constructive termination claim. Similarly, they argued that the dealers' constructive nonrenewal claims necessarily failed because seven of the eight dealers had signed and operated under renewal agreements with Motiva, and the eighth had sold his franchise prior to the expiration of his franchise agreement. The District Court denied these motions, and Shell and Motiva appealed.

The First Circuit affirmed in part and reversed in part. In affirming the judgment on the dealers' constructive termination claims, the Court of Appeals held that a franchisee is not required to abandon its franchise to recover for constructive termination under the PMPA. See 524 F. 3d, at 45–47. Instead, the court ruled, a simple breach of contract by an assignee of a franchise agreement can amount to constructive termination under the Act, so long as the breach resulted in "such a material change that it effectively ended the lease, even though the [franchisee] continued to operate [its franchise]." *Id.*, at 46 (internal quotation marks omitted). Turning to the dealers' constructive nonrenewal claims, the First Circuit agreed with Shell and Motiva that a franchisee cannot maintain a claim for unlawful nonrenewal under the PMPA "where the franchisee has signed and operates under the renewal

—————

agreements with the dealers. The jury found in favor of the dealers on this claim, and the Court of Appeals affirmed. 524 F. 3d, at 51. That issue is not before us.

agreement complained of." *Id.*, at 49. The court thus reversed the judgment on those claims.

   We granted certiorari. See 557 U. S. ___ (2009).

## II

   The first question we are asked to decide is whether a service-station franchisee may recover for constructive termination under the PMPA when the franchisor's allegedly wrongful conduct did not force the franchisee to abandon its franchise. For the reasons that follow, we conclude that a necessary element of any constructive termination claim under the Act is that the franchisor's conduct forced an end to the franchisee's use of the franchisor's trademark, purchase of the franchisor's fuel, or occupation of the franchisor's service station.[4]

## A

   When given its ordinary meaning, the text of the PMPA prohibits only that franchisor conduct that has the effect of ending a franchise. As relevant here, the Act provides that "no franchisor . . . may . . . terminate any franchise," except for an enumerated reason and after providing written notice. 15 U. S. C. §2802(a)–(b). The Act specifies that "[t]he term 'termination' includes cancellation," §2801(17), but it does not further define the term "terminate" or the incorporated term "cancel." We therefore give

_____

   [4] Because resolving this question is sufficient to decide these cases, we need not address Shell and Motiva's alternative argument that the PMPA does not embrace claims for constructive termination at all. Several Courts of Appeals have held that the Act does create a cause of action for constructive termination. See, *e.g.,* 524 F. 3d, at 44–45 (case below); *Clark* v. *BP Oil Co.*, 137 F. 3d 386, 390–391 (CA6 1998); *Shukla* v. *BP Exploration & Oil, Inc.*, 115 F. 3d 849, 852–853 (CA11 1997). Others have reserved judgment on the issue. See, *e.g., Abrams Shell* v. *Shell Oil Co.*, 343 F. 3d 482, 486–488 (CA5 2003); *Portland 76 Auto/Truck Plaza, Inc.* v. *Union Oil Co. of Cal.*, 153 F. 3d 938, 948 (CA9 1998). We leave the question for another day.

those terms their ordinary meanings. See *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995).

The word "terminate" ordinarily means "put an end to." Webster's New International Dictionary 2605 (2d ed. 1957); see also The Random House Dictionary of the English Language 1465 (1967). The term "cancel" carries a similar meaning: to "annul or destroy." Webster's, *supra*, at 389; see also Random House, *supra*, at 215 ("to make void; revoke; annul"). The object of the verb "terminate" is the noun "franchise," a term the Act defines as "any contract" for the provision of one (or more) of the three elements of a typical petroleum franchise. §2801(1). Thus, when given its ordinary meaning, the Act is violated only if an agreement for the use of a trademark, purchase of motor fuel, or lease of a premises is "put [to] an end" or "annul[ed] or destroy[ed]." Conduct that does not force an end to the franchise, in contrast, is not prohibited by the Act's plain terms.

The same conclusion follows even if Congress was using the words "terminate" and "cancel" in their technical, rather than ordinary, senses. When Congress enacted the PMPA, those terms had established meanings under the Uniform Commercial Code.[5]   Under both definitions,

_____

[5] The difference between a "termination" and a "cancellation" under the Uniform Commercial Code relates to how the contracting party justifies its ending of the contractual relationship. A "termination" occurs when "either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach." U. C. C. §2–106(3) (1972 ed.). By contrast, a "cancellation" occurs when "either party puts an end to the contract for breach by the other." §2–106(4).

That difference might well explain why Congress felt compelled to specify that "cancellation[s]," no less than "termination[s]," are covered by the Act. Prior to the PMPA, franchisors often leveraged their greater bargaining power to end franchise agreements for minor or technical breaches by the franchisee. See, *e.g.*, *Chestnut Hill Gulf, Inc.* v. *Cumberland Farms, Inc.*, 940 F. 2d 744, 746–747 (CA1 1991). By specifying that the Act covers "cancellation[s]" as well as "termina-

however, a "termination" or "cancellation" occurs only when a contracting party "puts an end to the contract." U. C. C. §2–106(3)–(4) (1972 ed.); see also U. C. C. §2–106(3)–(4), 1 U. L. A. 695, 695–696 (2004). Thus, a franchisee who continues operating a franchise—occupying the same premises, receiving the same fuel, and using the same trademark—has not had the franchise "terminate[d]" in either the ordinary or technical sense of the word.

Requiring franchisees to abandon their franchises before claiming constructive termination is also consistent with the general understanding of the doctrine of constructive termination. As applied in analogous legal contexts—both now and at the time Congress enacted the PMPA—a plaintiff must actually sever a particular legal relationship in order to maintain a claim for constructive termination. For example, courts have long recognized a theory of constructive discharge in the field of employment law. See *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 141–143 (2004) (tracing the doctrine to the 1930's). To recover for constructive discharge, however, an employee generally is required to quit his or her job. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 1449 (4th ed. 2007); 3 L. Larson, Labor and Employment Law §59.05[8] (2009); 2 EEOC Compliance Manual §612.9(a) (2008); cf. *Suders*, *supra*, at 141–143, 148; *Young* v. *Southwestern Savings & Loan Assn.*, 509 F. 2d 140, 144 (CA5 1975); *Muller* v. *United States Steel Corp.*, 509 F. 2d 923, 929 (CA10 1975). Similarly, landlord-tenant law has long recognized the concept of constructive eviction. See Rapacz, Origin and Evolution of Constructive Eviction in the United States, 1 DePaul L. Rev. 69 (1951). The general

––––––––

tion[s]," Congress foreclosed any argument that a termination for breach is not covered by the Act because it is technically a "cancellation" rather than a "termination."

rule under that doctrine is that a tenant must actually move out in order to claim constructive eviction.  See *id.*, at 75; Glendon, The Transformation of American Landlord-Tenant Law, 23 Boston College L. Rev. 503, 513–514 (1982); 1 H. Tiffany, Real Property §§141, 143 (3d ed. 1939).[6]

As generally understood in these and other contexts, a termination is deemed "constructive" because it is the plaintiff, rather than the defendant, who formally puts an end to the particular legal relationship—not because there is no end to the relationship at all.  There is no reason why a different understanding should apply to constructive termination claims under the PMPA.  At the time when it enacted the statute, Congress presumably was aware of how courts applied the doctrine of constructive termination in these analogous legal contexts.  See *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op, at 11–12).  And in the absence of any contrary evidence, we think it reasonable to interpret the Act in a way that is consistent with this well-established body of law.

The Court of Appeals was of the view that analogizing to doctrines of constructive termination in other contexts was inappropriate because "sunk costs, optimism, and the

––––––––––

[6] Before Congress enacted the PMPA, at least one court, it is true, had held that a tenant asserting constructive eviction could obtain *declaratory* relief without abandoning the premises—although the court observed that the tenant still would have to abandon the premises in order to obtain rescission.  See *Charles E. Burt, Inc.* v. *Seven Grand Corp.*, 340 Mass. 124, 129–130, 163 N. E. 2d 4, 7–8 (1959).  But as even the dealers concede, see Tr. of Oral Arg. 37–38, the clear majority of authority required a tenant to leave the premises before claiming constructive eviction.

For similar reasons, the Second Restatement of Property is of no help to the dealers.  Although it would allow a tenant to bring a constructive eviction claim without moving out, it noted that this proposition was "contrary to the present weight of judicial authority."  1 Restatement (Second) of Property §6.1, Reporter's Note 1, p. 230 (1976).

habit of years might lead franchisees to try to make the new arrangements work, even when the terms have changed so materially as to make success impossible." 524 F. 3d, at 46. But surely these same factors compel employees and tenants—no less than service-station franchisees—to try to make their changed arrangements work. Nonetheless, courts have long required plaintiffs asserting such claims to show an actual severance of the relevant legal relationship. We see no reason for a different rule here.

Additionally, allowing franchisees to obtain PMPA relief for conduct that does not force an end to a franchise would extend the reach of the Act much further than its text and structure suggest. Prior to 1978, the regulation of petroleum franchise agreements was largely a matter of state law. See *Dersch Energies, Inc.* v. *Shell Oil Co.*, 314 F. 3d 846, 861 (CA7 2002); Comment, 32 Emory L. J. 273, 277–283 (1983). In enacting the PMPA, Congress did not regulate every aspect of the petroleum franchise relationship but instead federalized only the two parts of that relationship with which it was most concerned: the circumstances in which franchisors may terminate a franchise or decline to renew a franchise relationship. See 15 U. S. C. §2802; *Dersch Energies, supra*, at 861–862. Congress left undisturbed state-law regulation of other types of disputes between petroleum franchisors and franchisees. See §2806(a) (pre-empting only those state laws governing franchise terminations or nonrenewals).

The dealers would have us interpret the PMPA in a manner that ignores the Act's limited scope. On their view, and in the view of the Court of Appeals, the PMPA prohibits, not just unlawful terminations and nonrenewals, but also certain serious breaches of contract that do not cause an end to the franchise. See Brief for Respondents in No. 08–372, pp. 28–35 (hereinafter Respondents' Brief); 524 F. 3d, at 44–47. Reading the Act to prohibit

simple breaches of contract, however, would be inconsistent with the Act's limited purpose and would further expand federal law into a domain traditionally reserved for the States. Without a clearer indication that Congress intended to federalize such a broad swath of the law governing petroleum franchise agreements, we decline to adopt an interpretation of the Act that would have such sweeping consequences. See, *e.g.*, *United States* v. *Bass*, 404 U. S. 336, 349 (1971).[7]

Finally, important practical considerations inform our decision. Adopting the dealers' reading of the PMPA would require us to articulate a standard for identifying those breaches of contract that should be treated as effectively ending a franchise, even though the franchisee in fact continues to use the franchisor's trademark, purchase the franchisor's fuel, and occupy the service-station premises.[8] We think any such standard would be indeterminate and unworkable. How is a court to determine

––––––––––

[7] Adopting such a broad reading of the PMPA also would have serious implications for run-of-the-mill franchise disputes. The Act *requires* courts to award attorney's fees and expert-witness fees in any case in which a plaintiff recovers more than nominal damages. See 15 U. S. C. §2805(d)(1)(C). The Act also permits punitive damages, §2805(d)(1)(B), a remedy ordinarily not available in breach-of-contract actions, see *Barnes* v. *Gorman*, 536 U. S. 181, 187–188 (2002). Accepting the dealers' reading of the statute, therefore, would turn everyday contract disputes into high-stakes affairs.

[8] The First Circuit, for example, approved of a test that asks whether the breach resulted in "such a material change that it effectively ended the lease, even though the plaintiffs continued to operate [their franchises]." 524 F. 3d, at 46 (internal quotation marks omitted). That standard, it seems to us, does little more than restate the relevant question. While we do not decide whether the PMPA contemplates claims for constructive termination, we observe that the Court of Appeals' unwillingness or inability to establish a more concrete standard underscores the difficulties and inherent contradictions involved in crafting a standard for finding a "termination" when no termination has in fact occurred.

whether a breach is serious enough effectively to end a franchise when the franchisee is still willing and able to continue its operations? And how is a franchisor to know in advance which breaches a court will later determine to have been so serious? The dealers have not provided answers to these questions. Nor could they. Any standard for identifying when a simple breach of contract amounts to a PMPA termination, when all three statutory elements remain operational, simply evades coherent formulation.

B

The dealers suggest that this interpretation of the PMPA fails to provide franchisees with much-needed protection from unfair and coercive franchisor conduct that does not force an end to the franchise. That argument, however, ignores the fact that franchisees still have state-law remedies available to them. The pre-emptive scope of the PMPA is limited: The Act pre-empts only those state or local laws that govern the termination of petroleum franchises or the nonrenewal of petroleum franchise relationships. See 15 U. S. C. §2806(a). Outside of those areas, therefore, franchisees can still rely on state-law remedies to address wrongful franchisor conduct that does not have the effect of ending the franchise. Indeed, that happened in this very lawsuit. The dealers argued in the District Court that Motiva's elimination of the rent subsidy not only constructively terminated their franchises in violation of the PMPA but also amounted to a breach of contract under state law. The jury found in their favor on their state-law claims and awarded them almost $1.3 million in damages. See App. 376–379. Thus, the dealers' own experience demonstrates that franchisees do not need a PMPA remedy to have meaningful protection from abusive franchisor conduct.

The dealers also charge that this interpretation of the PMPA cannot be correct because it renders other provi-

sions of the Act meaningless. Respondents' Brief 21–22, 24–25. While we agree that we normally should construe statutes "in a manner that gives effect to all of their provisions," we believe our interpretation is faithful to this "well-established principl[e] of statutory interpretation." *United States ex rel. Eisenstein* v. *City of New York*, 556 U. S. ___, ___ (2009) (slip op., at 5)

To begin, the dealers insist that our reading of the term "terminate" will require franchisees to go out of business before they can obtain preliminary relief and thus will render useless the Act's preliminary injunction mechanism. We disagree. To obtain a preliminary injunction, it is true, a franchisee must show, among other things, that "the franchise of which he is a party *has been terminated*." 15 U. S. C. §2805(b)(2)(A)(i) (emphasis added). But that does not necessarily mean that a franchisee must go *out of business* before obtaining an injunction. For example, in cases of actual termination, the Act requires franchisors to provide franchisees with written notice of termination well in advance of the date on which the termination "takes effect." §2804(a). A franchisee that receives notice of termination "has been terminated" within the meaning of §2805(b)(2)(A)(i), even though the termination "takes effect" on a later date, just as an employee who receives notice of discharge can be accurately described as *having been* discharged, even though the employee's last day at work may perhaps be weeks later. Thus, franchisees that receive notice of impending termination can invoke the protections of the Act's preliminary injunction mechanism well before having to go out of business.[9] Contrary to the

––––––––

[9] The Government reads the Act to permit a dealer to seek preliminary injunctive relief if a franchisor announces its "intent to engage in conduct that would leave the franchisee no reasonable alternative but to abandon" one (or more) of the franchise elements. Brief for United States as *Amicus Curiae* 21. Because we do not decide whether the PMPA permits constructive termination claims at all, see n. 4, *supra*,

dealers' assertions, therefore, our interpretation of the Act gives meaningful effect to the PMPA's preliminary injunction provisions.

Our interpretation also gives effect to the Act's alternative statute-of-limitations accrual dates. The 1-year limitations period governing PMPA claims runs from the later of either (1) "the date of termination of the franchise" *or* (2) "the date the franchisor fails to comply with the requirements of" the Act. §2805(a). Some violations of the PMPA, however, cannot occur until *after* a franchise has been terminated. See, *e.g.*, §2802(d)(1) (franchisor must share with a franchisee certain parts of a condemnation award when the termination was the result of a condemnation or taking); §2802(d)(2) (franchisor must grant a franchisee a right of first refusal if the franchise was terminated due to the destruction of the service station and the station subsequently is rebuilt). The second accrual date listed in §2805(a), therefore, shows only that the limitations period runs from the date of these types of post-termination violations. It does not suggest that Congress intended franchisees to maintain claims under the PMPA to redress franchisor conduct that does not force an end to the franchise.

\*      \*      \*

We therefore hold that a necessary element of any constructive termination claim under the PMPA is that the complained-of conduct forced an end to the franchisee's use of the franchisor's trademark, purchase of the franchisor's fuel, or occupation of the franchisor's service station. Because none of the dealers in this litigation abandoned any element of their franchise operations in response to Motiva's elimination of the rent subsidy,[10] they cannot

—————

we need not address this argument.

[10] After Motiva withdrew the rent subsidy, seven of the dealers continued operating their franchises for the full terms of their franchise

maintain a constructive termination claim on the basis of that conduct.

## III

The second question we are asked to decide is whether a franchisee who is offered and signs a renewal agreement can nonetheless maintain a claim for "constructive nonrenewal" under the PMPA. For reasons similar to those given above, we agree with the Court of Appeals that a franchisee that chooses to accept a renewal agreement cannot thereafter assert a claim for unlawful nonrenewal under the Act.[11]

The plain text of the statute leaves no room for a franchisee to claim that a franchisor has unlawfully declined

—————

agreements and then signed new agreements that did not include the subsidy. See App. 161, 164, 316–321 (Mac's Shell Service, Inc.); *id*., at 138–139, 314–315 (Cynthia Karol); *id*., at 154–155, 310–311 (Akmal, Inc.); *id*., at 185–186, 268–269 (Sid Prashad); *id*., at 190, 312–313 (J & M Avramidis, Inc.); *id*., at 179–182, 322–323 (RAM Corp., Inc.); *id*., at 148–153, 324–325 (John A. Sullivan). These dealers necessarily cannot establish that the elimination of the subsidy "terminate[d]" their franchises "prior to the conclusion of the term" stated in their franchise agreements. 15 U. S. C. §2802(a)(1). Whether they ceased operations *after* their franchise agreements expired, moreover, is irrelevant. Indeed, in the Court of Appeals, the dealers abandoned any claim for constructive termination based on the subsequent franchise agreements. See Appellees' Brief in No. 05–2770 etc. (CA1), p. 40, n. 29.

One dealer did leave his franchise before his franchise agreement expired. App. 204, 330–331 (Stephen Pisarczyk). But that dealer not only continued to operate for seven months after the subsidy ended, *id*., at 204, but also during that period entered into an agreement with Motiva to extend the term of his franchise agreement, *id*., at 330–331. Moreover, that dealer had been planning to leave the service-station business before Motiva eliminated the subsidy, and he never claimed that his decision to leave had anything to do with Motiva's rent policies. See *id*., at 202–207.

[11] As is true with respect to the dealers' constructive termination claims, it is not necessary for us to decide in these cases whether the Act at all recognizes claims for "constructive nonrenewal." We therefore do not express a view on that question.

to renew a franchise relationship—constructively or oth-
erwise—when the franchisee has in fact accepted a new
franchise agreement. As relevant here, a franchisor vio-
lates the PMPA only when it "fail[s] to renew" a franchise
relationship for a reason not provided for in the Act or
after not providing the required notice. See 15 U. S. C.
§2802. The Act defines the term "fail to renew," in turn,
as a "failure to reinstate, continue, or extend the franchise
relationship." §2801(14). Thus, the threshold require-
ment of any unlawful nonrenewal action—a requirement
the franchisee bears the burden of establishing, see
§2805(c)—is that the franchisor did not "reinstate, con-
tinue, or renew" the franchise relationship once a fran-
chise agreement expired. But if a franchisee signs a re-
newal agreement, the franchisor clearly has "reinstate[d],
continue[d], or extend[ed]" the franchise relationship.
True, the franchisee might find some of the terms in the
new agreement objectionable. But the Act prohibits only
unlawful "fail[ures] to renew" a franchise relationship, not
renewals of a franchise relationship on terms that are less
than favorable to the franchisee. A franchisee that signs a
renewal agreement, in short, cannot carry the threshold
burden of showing a "nonrenewal of the franchise rela-
tionship," §2805(c), and thus necessarily cannot establish
that the franchisor has violated the Act.

The dealers point out that several of them signed their
renewal agreements "under protest," and they argue that
they thereby explicitly preserved their ability to assert a
claim for unlawful nonrenewal under the PMPA. That
argument misunderstands the legal significance of signing
a renewal agreement. Signing a renewal agreement does
not constitute a waiver of a franchisee's legal rights—
something that signing "under protest" can sometimes
help avoid. See, *e.g.*, U. C. C. §1–207, 1 U. L. A. 318.
Instead, signing a renewal agreement negates the very
possibility of a violation of the PMPA. When a franchisee

signs a renewal agreement—even "under protest"—there has been no "fail[ure] to renew," and thus the franchisee has no cause of action under the Act.  See 15 U. S. C. §2805(a).

The Act's structure and purpose confirm this interpretation.  By requiring franchisors to renew only the "franchise relationship," as opposed to the same franchise agreement, see §2802; see also §2801(2), the PMPA contemplates that franchisors can respond to market demands by proposing new and different terms at the expiration of a franchise agreement.  To that end, the Act authorizes franchisors to decline to renew a franchise relationship if the franchisee refuses to accept changes or additions that are proposed "in good faith and in the normal course of business" and that are not designed to convert the service station to direct operation by the franchisor.  §2802(b)(3)(A).  Additionally, the Act creates a procedural mechanism for resolving disputes over the legality of proposed new terms.  If the parties cannot agree, the franchisor has the option of either modifying the objectionable terms or pursuing nonrenewal, in which case it must provide the franchisee with written notice well in advance of the date when the nonrenewal takes effect.  §2804(a)(2).  Once the franchisee receives notice of nonrenewal, it can seek a preliminary injunction under the Act's relaxed injunctive standard, maintaining the status quo while a court determines the lawfulness of the proposed changes.  See §2805(b)(2); *supra,* at 13.[12]

─────────

[12] The availability of preliminary injunctive relief under the Act also explains why the dealers are wrong to suggest that our holding will force franchisees "to choose between accepting an unlawful and coercive contract in order to stay in business [or] rejecting it and going out of business in order to preserve a cause of action."  Respondents' Brief 51 (internal quotation marks omitted).  A franchisee presented with "unlawful and coercive" terms can simply reject those terms and, if the franchisor pursues nonrenewal, seek a preliminary injunction under

Allowing franchisees to pursue nonrenewal claims even after they have signed renewal agreements would undermine this procedural mechanism and, in the process, would frustrate franchisors' ability to propose new terms. Under the dealers' theory, franchisees have no incentive to object to burdensome new terms and seek a preliminary injunction if a franchisor pursues nonrenewal. Instead, a franchisee could simply sign the new franchise agreement and decide later whether to sue under the PMPA. Franchisees would then have the option of either continuing to operate under the new agreement or, if the terms of the agreement later proved unfavorable, bringing suit under the PMPA alleging that the newly imposed terms are unlawful. And because the PMPA has a 1-year statute of limitations, see §2805(a), franchisees would retain that option for the entire first year of a new franchise agreement. Accepting the dealers' argument, therefore, would cast a cloud of uncertainty over all renewal agreements and could chill franchisors from proposing new terms in response to changing market conditions and consumer needs.

Finally, accepting the dealers' argument would greatly expand the PMPA's reach. Under the balance struck by the plain text of the statute, a franchisee faced with objectionable new terms must decide whether challenging those terms is worth risking the nonrenewal of the franchise relationship; if the franchisee rejects the terms and the

———————

the Act once the franchisee receives notice of nonrenewal. Indeed, the PMPA substantially relaxes the normal standard for obtaining preliminary-injunctive relief, §2805(b)(2)(A)(ii), thus allowing a franchisee with anything close to a meritorious claim to obtain relief.

It is possible, of course, that a franchisor could fail to renew a franchise relationship *without* providing the statutorily required notice. But in that circumstance, a franchisee would not only have a surefire claim for unlawful nonrenewal, see §2802(b)(1)(A), but also presumably could seek a preliminary injunction forcing the franchisor to resume providing the franchise elements for the duration of the litigation.

franchisor seeks nonrenewal, the franchisee runs the risk that a court will ultimately determine that the proposed terms were lawful under the PMPA. See §2802(b)(3)(A). That risk acts as a restraint, limiting the scope of franchisor liability under the Act to that with which Congress was most concerned: the imposition of arbitrary and unreasonable new terms on a franchisee that are designed to force an end to the petroleum franchise relationship. See, *e.g.*, *ibid.;* Comment, 32 Emory L. J., at 277–283. Allowing franchisees both to sign a franchise agreement and to pursue a claim under the PMPA would eliminate that restraint and thus permit franchisees to challenge a much broader range of franchisor conduct—conduct to which the dealer might object but not consider so serious as to risk the nonrenewal of the franchise by mounting a legal challenge. As explained, the PMPA was enacted to address the narrow areas of franchise terminations and nonrenewals, not to govern every aspect of the petroleum franchise relationship. See *supra*, at 10; *Dersch Energies*, 314 F. 3d, at 861. We thus decline to adopt an interpretation that would expand the Act in such a fashion.[13]

\* \* \*

We hold that a franchisee who is offered and signs a renewed franchise agreement cannot maintain a claim for unlawful nonrenewal under the PMPA. We therefore affirm the judgment of the Court of Appeals with respect

---

[13] It also is worth noting that, although the concept of "constructive nonrenewal" does not arise frequently in other areas of the law, the little authority on this concept supports our conclusion that a plaintiff who signs a new agreement cannot maintain a claim for constructive nonrenewal. See *American Cas. Co. of Reading, Pa.* v. *Baker*, 22 F. 3d 880, 892–894 (CA9 1994) (insured who accepts a successor insurance policy cannot maintain a claim for constructive nonrenewal of the previous policy); *American Cas. Co. of Reading, Pa.* v. *Continisio*, 17 F. 3d 62, 65–66 (CA3 1994) (same); *Adams* v. *Greenwood*, 10 F. 3d 568, 572 (CA8 1993) (same).

to the dealers' nonrenewal claims.

## IV

The judgment of the Court of Appeals is reversed in part and affirmed in part.  The cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*