NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0497n.06

No. 09-1573

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 18, 2011*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| SKYLINE PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| POSEN CONSTRUCTION, INC., | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: MARTIN and GIBBONS, Circuit Judges; and MARBLEY, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Skyline Products, Inc.
("Skyline") contends that defendant-appellee Posen Construction, Inc. ("Posen") breached a sales
contract for the purchase of electronic highway information signs by failing to facilitate Skyline's
submission of design proposals to the Michigan Department of Transportation ("MDOT") and by
precipitously terminating the contract without reasonable notice. The district court granted summary
judgment to Posen, concluding that, by failing to obtain MDOT approval of its design proposals,
Skyline did not satisfy a condition precedent contained in the purchase-order agreement, thereby
voiding Posen's duty to perform under the contract.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District
of Ohio, sitting by designation.

1

No. 09-1573
*Skyline Prods., Inc. v. Posen Constr., Inc.*

For the following reasons, we affirm the judgment of the district court.

**I.**

Posen was hired as a general contractor by MDOT for a large-scale highway construction project that included the installation of Dynamic Message Signs ("DMS"), large electronic signs whose messages can be changed remotely. Posen sought subcontractor bids for the manufacturing of DMS units, for which Skyline submitted the lowest bid.

On March 20, 2006, Posen issued an initial purchase order to Skyline for two sizes of DMS units. The purchase order contained several statements relating to MDOT requirements and approval:

> SUBMIT APPROVAL DRAWINGS ASAP
>
> THIS ORDER IS CONTINGENT UPON STATE APPROVAL OF SUBMITTAL DRAWINGS
> . . .
>
> MUST BE PER MDOT SPECIFICATIONS
> It is expressly understood that all labor & materials shall be in strict accordance with the owners [sic] plans and specifications
>
> HOLD FOR RELEASE PENDING RECEIPT OF APPROVED DRAWINGS.

Skyline submitted DMS shop drawings for MDOT approval. HNTB, an outside engineering firm contracted by the MDOT to provide design and construction oversight on its behalf, reviewed the submission, and in June 2006 provided comments identifying several deficiencies in the submission regarding the small DMS signs ordered by MDOT. On July 17, 2006, Skyline provided a second small-sign submittal to MDOT.

In October 2006, however, MDOT significantly revised its DMS design specifications and rejected all prior submissions. The revised specification required that there be a one-to-one ratio of circuit boards to display modules, so that each display module within a particular sign would have its own circuit board through which the signals governing the illumination of LED pixels would be passed. Posen then solicited new bids on the revised specifications.

On November 2, 2006, representatives from MDOT, HNTB, Posen, and Skyline attended a progress meeting on the highway construction project in which the parties discussed the revised specifications. Posen indicated that Skyline could accommodate the new specifications, but because of initial concerns in meeting production deadlines associated with the initial specifications, Skyline had already began production of a number of large DMS signs compliant with the original specifications. According to the meeting minutes, because Skyline began construction in anticipation of approval of the original shop drawings, it acknowledged that it assumed all risk and responsibility associated with the early production. The meeting minutes further indicate that all parties anticipated that delays and cost adjustments would be forthcoming in light of the revised specifications.

After some exchanges between Posen and Skyline over pricing related to the revised DMS specifications, Posen ultimately issued Skyline a revised purchase order for DMS units with the revised specifications. The November 15, 2006, revised purchase order contained the same statements regarding MDOT specifications and approval that were contained in the initial purchase order.

Skyline reviewed the revised specifications and, based on its experience in constructing DMS signs, identified a possible improvement that could be gained through an alteration of the design specifications. According to Skyline, if the signs were built without the inclusion of additional circuit boards on the backs of each LED module but rather utilized line drivers exclusively, the signs would avoid the connection problems between the circuit boards and other components that routinely plagued DMS units. It therefore decided to propose the elimination of the additional circuit boards required under the revised design specifications.

Skyline then submitted shop drawings for approval by HNTB under the revised purchase order. The first submittal, dated December 12, 2006, identified the circuit board connection issues and proposed eliminating the additional circuit boards on the back of each LED display module. On January 18, 2007, engineers from HNTB e-mailed Skyline with questions on its suggestion to alter the display module designs. Skyline responded on January 23, 2007. In its e-mail, Skyline described several advantages that it contended were associated with the use of fewer circuit boards:

> There are many fewer connections to fail with 3 line drivers vs. up to 75 display drivers per sign. Less troubleshooting is involved, so repairs take less time. Also, because there are fewer boards involved, agencies need to carry fewer spare parts in inventory.

On January 29, 2007, HNTB formally rejected Skyline's submittal based upon a failure to include a five-year warranty and for not meeting the driver board specifications for the LED module. Regarding Skyline's proposed specification revisions, HNTB noted that "[u]pon careful consideration of this request for variance, it has been decided that it is in the Department's best interest at this time to adhere to the specification and therefore require that each display module has [sic] a separate driver board." On January 30, 2007, however, HNTB sent an e-mail to Skyline

4

inquiring about the cost savings associated with the possible elimination of components inside the small DMS signs. The following day, the lead engineer from HNTB called the regional sales engineer at Skyline regarding the submittal clarification questions received on January 18. The parties discussed the design and reasoning behind the single-driver-board per-line design. According to an e-mail from Skyline recounting the conversation:

> David [of HNTB] agreed with us that our design is probably better but he wasn't sure what [sic] Michelle Mueller & MDOT would agree. We left the conversation on the table and David was going to speak with Michelle to see if we can proceed with our single driver board design or if we will be required to add driver boards to match the display boards. MDOT's worry is if the single driver board goes down they will loose the entire line of display modules and our counter was less points of failure and easier troubleshooting and maintenance.

According to Skyline, following the conversation it was Skyline's and HNTB's agreement that HNTB would meet with MDOT to discuss Skyline's proposal, and if the state rejected the new proposal, Skyline would resubmit a proposal in conformity with the revised specification.

On February 2, 2007, Posen sent Skyline a letter regarding its purchase order. The letter stated:

> It has been over 3 months since Skyline received MDOT revisions and we still do not have approved shop drawings in hand.
>
> Please consider this your notice that unless we receive shop drawings that meet all of MDOT's requirements by Wednesday, February 7, 2007, Posen Construction, Inc. will consider our Purchase Order #699-26-08 null and void.

Skyline responded by e-mail and requested that Posen facilitate a face-to-face meeting between Skyline and the decision makers at MDOT and HNTB. Paul Chytka of Skyline then spoke by phone with Todd Spina of Posen about Posen's letter. Chytka confirmed this call with an e-mail that read: "Thanks for the call back today. Also, thanks for clarifying that your letter of Feb. 2[ ] was intended

5

to keep the submittal process moving forward and not an ultimatum that you will cancel the order if the MDOT does not approve our submittals by Wednesday, Feb. 7[ ]. . . . We will email the submittal response to the 1st rejection on Feb. 7[ ]."

On February 7, 2007, Skyline submitted its second set of plans setting out in further detail its proposed design changes regarding the LED display module. It also noted that Skyline's bid to Posen included a shorter warranty than that included in the revised specification, and consequently the warranty should be imposed on Posen as MDOT's vendor. According to Skyline, it believed that this submittal was entirely consistent with its understanding of its January 31 conversation with HNTB.

At a February 15, 2007, progress meeting HNTB indicated that it had rejected Skyline's second submittal because it failed to comply with the driver board requirements contained in the specifications and because it did not provide a five-year warranty. According to the meeting minutes, HNTB indicated that "[t]hese concerns were stated in a letter to Skyline from HNTB but Skyline chose not to address [them]." The minutes then stated that a letter would be sent from HNTB to MDOT and Posen detailing the rejection of the submittal. Finally, it was noted that "Posen must now either resubmit with Skyline or will investigate the utilization of alternative suppliers for the Large and Small DMS signs."

On February 16, 2007, Posen terminated the Skyline purchase order. In an e-mail sent to Skyline, Posen stated that it "[had] been verbally instructed to begin the search for another vendor."

Skyline filed its complaint on July 9, 2007, asserting claims for breach of contract and promissory estoppel.[1] On August 20, 2008, Posen filed a motion for summary judgment. The district court granted Posen's motion on March 31, 2009, concluding that by failing to obtain MDOT approval of its design proposals Skyline did not satisfy a condition precedent contained in the purchase-order agreement, thereby voiding Posen's duty to perform under the contract. *Skyline*, 2009 WL 909568, at *4. Skyline timely appealed.

## II.

This court reviews a district court's grant of summary judgment *de novo*. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008); *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (*en banc*). Summary judgment is proper "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In order to defeat a summary judgment motion, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Kiemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). A fact is "material" only when it might affect the outcome of the suit under the governing law. *Id.*; *see also Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986).

---

[1]Skyline subsequently withdrew its promissory estoppel claim upon Posen's motion for summary judgment. *See Skyline Prods., Inc. v. Posen Constr., Inc.*, No. 07-12855, 2009 WL 909568, at *2 n.10 (E.D. Mich. Mar. 31, 2009).

No. 09-1573
*Skyline Prods., Inc. v. Posen Constr., Inc.*

**A.**

Under Michigan law,[2] a condition precedent is "a fact or event that the parties intend must take place before there is a right to performance." *Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007) (quoting *Mikonczyk v. Detroit Newspapers Inc.*, 605 N.W.2d 360, 362 (Mich. 1999)). "A condition precedent is distinguished from a promise in that it creates no right or duty in itself, but is merely a limiting or modifying factor." *Mikonczyk*, 605 N.W.2d at 362 (citing *Reed v. Citizens Ins. Co*, 499 N.W.2d 22, 24 (Mich. Ct. App. 1993)). As such, the "[f]ailure to satisfy a condition precedent prevents a cause of action for failure of performance." *Able Demolition, Inc. v. Pontiac*, 739 N.W.2d 696, 700 (Mich. Ct. App. 2007) (quoting *Berkel Co. Contractors v. Christman Co.*, 533 N.W.2d 838, 840 (Mich. Ct. App. 1995)); *see also Knox v. Knox*, 59 N.W.2d 108, 112 (Mich. 1953) ("If the condition is not fulfilled, the right to enforce the contract does not come into existence." (quoting *Lach v. Cahill*, 85 A.2d 481, 482 (Conn. 1951))).

A party, however, may not "avoid liability on [a] contract for the failure of a condition precedent where [it] caused the failure of the condition." *Harbor Park Market*, 743 N.W.2d at 588.

---

[2]The parties agree that Michigan law controls this case. In a diversity case, of course, a federal court must apply the forum state's choice-of-law rules. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941)). The Michigan Supreme Court has stated that "although it has not abandoned the traditional 'law of the place of contracting' rule, it will apply the policy-centered approach set forth in § 188 of the Restatement (Second) of Conflicts of Laws in appropriate cases." *Id.* at 741 (citing *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 n.28 (Mich. 1995)). In appropriate cases, then, "courts should apply the law of the state that has the most significant relationship to the transaction and parties," taking into account the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the locality ties of the parties. *Id.* (quoting Restatement (Second) of Conflict of Laws § 188(2) (1971)). Both approaches greatly favor the application of Michigan law in this case.

This is because "when a contract contains a condition precedent, 'there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event.'" *Id.* (quoting *Mehling v. Evening News Ass'n*, 132 N.W.2d 25, 26 (Mich. 1965)). Therefore, "[w]here a party prevents the occurrence of the condition, the party . . . waives the performance of the condition[,] . . . 'the performance of [the] condition precedent is discharged or excused, and the conditional promise [is] made an absolute one.'" *Id.* at 589 (quoting *Mehling*, 132 N.W. 2d at 26). For waiver to occur under Michigan law, "a party must prevent the condition from occurring by either taking some affirmative action, or by refusing to take action required under the contract." *Id*.

The parties agree that the language in the purchase order created a contract containing a condition precedent under which Posen's performance obligation did not arise until Skyline obtained MDOT approval of its sign submittals by MDOT. Indeed, the purchase order contains express language indicating that the order was contingent on MDOT approval of submittal drawings and would be held "for release pending receipt of approval drawings." It is further uncontested that Skyline failed to obtain MDOT approval of its shop-drawing submittals. Therefore, unless that condition was rendered invalid by waiver, Skyline's claim for breach of contract must fail under Michigan law. *See, e.g.*, *Harbor Park Market*, 743 N.W.2d at 588–89; *Knox*, 59 N.W.2d at 112.

## I.

Skyline first contends that Posen waived the MDOT-approval condition by failing "to facilitate communications between Skyline and MDOT so as to enable Skyline to obtain approval of its DMS submittals." It asserts that Posen was obligated to secure a meeting between Skyline and MDOT when asked to do so because Posen "served as Skyline's sole conduit of information to

MDOT" and did not have the technical comprehension regarding DMS technology to advocate Skyline's design position effectively. Skyline therefore appears to read the purchase order to contain an implied obligation on Posen, based in the covenant of good faith and fair dealing,[3] to facilitate the communication of information between Skyline and MDOT, including the arrangement of a face-to-face meeting between MDOT and Skyline.

Under Michigan law, "[t]he goal of contract interpretation is first to determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Market*, 743 N.W.2d at 588; *see also Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003). "If no reasonable person could dispute the meaning of ordinary and plain contract language, the Court must accept and enforce the language as written," *Harbor Park Market*, 743 N.W.2d at 588, because "an unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Quality Prods.*, 666 N.W.2d at 259.

The obligations that Skyline alleges Posen assumed in the purchase-order agreement are wholly unsupported by the language of the purchase order. The contract's concise language stated only that the order was contingent on MDOT approval of Skyline's submittal drawings and that the order would be held for release pending such approval. This language does not itself evince an intention to create an obligation on the part of Posen either to facilitate communication between Skyline and MDOT or to arrange face-to-face meetings at Skyline's request. *See Harbor Park*

---

[3]Under Michigan's Uniform Commercial Code ("UCC"), "[e]very contract or duty . . . imposes an obligation of good faith in its performance or enforcement." Mich. Comp. Laws § 440.1203.

*Market*, 743 N.W.2d at 589 (holding that it would not judicially impose a limitation where the condition language was clear, unambiguous, and without limitation).

But Skyline argues that the parties' relationship, and in particular Posen's role as Skyline's sole conduit of information to MDOT, "impose[d] . . . the obligation to perform that role with good faith and fair dealing," particularly at "a crucial time." While it is true that Posen had a good-faith obligation not to interfere with Skyline's ability to secure MDOT approval of its submittal drawings, Skyline presents no evidence that the relationship between the parties required more than Posen's transmittal of Skyline's proposed submittal drawings and the responses in return between Skyline and MDOT. The evidence in the record reveals that Posen was diligent in transmitting each of Skyline's design submittals to MDOT for approval and took no affirmative steps to thwart MDOT approval. *See Harbor Park Market*, 743 N.W.2d at 589 (finding that there was no active interference with attorney-approval condition in contract). Skyline also fails to account for the fact that before it requested a face-to-face meeting it had already itself been in direct contact with HNTB regarding its design-change proposals and could have pursued that avenue of communication with MDOT. Good faith alone, without some evidence of the parties' intent, did not require Posen to facilitate Skyline's access to MDOT decision makers or to affirmatively advocate for a change in MDOT design specifications at Skyline's behest.

Skyline cannot rely on its allegations regarding the nature of the relationship between it and Posen but must come forward with sufficient evidence to create a genuine issue of material fact to survive summary judgment on the issue. *See Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009); *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002). Because Skyline presents no

evidence that Posen "refuse[d] to take action required under the contract" related to its role as an intermediary between Skyline and MDOT, Posen did not waive the condition precedent on that basis.

ii.

Skyline next contends that Posen violated its obligation to provide reasonable notice of termination under Mich. Comp. Laws § 440.2309[4] and argues that such failure waived the condition precedent regarding MDOT approval. In a corollary argument, Skyline contends that Posen's precipitous act of termination is itself "the sort of affirmative action that would prevent a party such as Skyline from satisfying conditions precedent," thereby resulting in waiver. *See KLT Indus., Inc. v. Eaton Corp.*, 505 F. Supp. 1072, 1079–80 (E.D. Mich 1981) (concluding there was wrongful termination where party would reasonably believe that it would have the opportunity to perform). Posen responds that its duty to provide reasonable notice of termination never arose because Skyline failed to meet the condition precedent contained in the purchase order. Posen further argues that Skyline's failure to procure MDOT approval of its design submittals at the time of termination was itself a breach under the contract, and this breach allowed it to justifiably cancel the contract as a remedy. Because these related arguments center on the nature and timing of Posen's ability to terminate the contract, we must consider the parties' performance and termination obligations under Michigan's Uniform Commercial Code.

---

[4]Section 440.2309 provides, in relevant part:

> Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

Mich. Comp. Laws § 440.2309(3).

The Michigan UCC sets forth the default parameters of a party's power to terminate or cancel a contract for the sale of goods. "The difference between a 'termination' and a 'cancellation' under the Uniform Commercial Code relates to how the contracting party justifies its ending of the contractual relationship." *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co.*, 130 S. Ct. 1251, 1258 n.5 (2010). "'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." Mich. Comp. Laws § 440.2106(3). "'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance." *Id.* § 440.2106(4). And, "[w]hile a termination . . . requires reasonable notice, a cancellation . . . does not." *Ultraflex Sys., Inc. v. Verseidag-Indutux GmbH*, No. Civ.A. 01-129, 2006 WL 1098181, at * 5 (D.N.J. March 30, 2006); *see Int'l Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488, 492 (5th Cir. 1983).

Where a party, however, ends a contract neither pursuant to a power created by agreement or law nor justifiably on account of breach by the other party, that party itself may be in breach for repudiating the contract. *See* Mich. Comp. Laws § 440.2610(b) ("When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . resort to any remedy for breach.") & cmt. 1 ("[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with

performance."). The impact of repudiation on the condition precedent contained in the contract is clear: it would serve to waive the condition precedent by preventing its occurrence. *See Lontz v. Cont'l Cas. Co.*, No. 281183, 2009 WL 794480, at *3 (Mich. Ct. App. Mar. 26, 2009) (citing 13 Richard A. Lord, Williston on Contracts § 39:39 (4th ed.)) ("[I]t is well settled that a repudiation of the contract by one party relieves the nonrepudiating party of the duty to perform any conditions precedent that may exist to the performance of the repudiating party."); *Baker v. Abramson*, No. 262272, 2005 WL 3304563, at *1–2 (Mich. Ct. App. Dec. 6, 2005).

Applying these legal principles to the facts in the record, which are undisputed in material part, we note initially that Posen's ending of the contractual relationship with Skyline represented a termination of the contract based on the failure of a condition precedent. It was not a cancellation that was based on a breach by Skyline. And Posen on this record could not be said to have breached the contract by repudiating it. Posen in no way prevented Skyline's compliance with the condition precedent, nor could it be said that it acted prematurely. The ending of the contract occurred almost a year after issuance of the initial purchase order, and the revised purchase order was issued some three months prior to termination. Skyline was aware that its submission under the revised purchase order contained suggested variations not contemplated by the revised specifications and was aware by around January 29, 2007, that HNTB had rejected its submission. After more back-and-forth communication, Skyline submitted another set of plans on February 7, 2007. These were rejected on February 15, 2007.

In arguing that Posen terminated prematurely, Skyline again returns to its argument that Posen should have arranged the meeting it requested with MDOT in an effort to procure the

opportunity for Skyline to present a third submittal. But given the time line of events here and the lack of any obligation on the part of Posen to arrange such a meeting, as we have already discussed, the failure to arrange a meeting cannot support a finding that termination was premature.

Posen argues that the contract was terminable at will, relying on Mich. Comp. Laws § 440.2309(2) and cases applying that provision. Section 440.2309(2), which relates to contracts providing for successive performance over an indefinite time, does not govern this dispute, which involves a contract for the one-time sale of goods.

We conclude instead that under Michigan law, whether Posen could properly terminate the contract for Skyline's inability to secure MDOT approval depends on whether a reasonable time had expired for fulfillment of that condition. *Surefil, LLC v. Bonne Bell, LLC*, No. 1:09-cv-379, 2010 WL 3059209, at \*4 (W.D. Mich. Aug. 4, 2010) ("Under the Michigan Commercial Code . . . the default time for performance, when not otherwise specified, is 'a reasonable time.'" (citation omitted)); Mich. Comp. Laws § 440.2309(1) ("The time for shipment or delivery or *any other action* under a contract if not provided in this article or agreed upon shall be a reasonable time.") (emphasis added) & cmt. 1 ("Subsection (1) requires that all actions taken under a sales contract must be taken within a reasonable time where no time has been agreed upon."). But we also conclude, given the facts of this case, a reasonable jury could not conclude that Posen did not wait a reasonable time before terminating for failure to fulfill the condition precedent. To be sure, Posen might have waited longer or done more to help Skyline. But the existence of another possible course of action does not make the course of action Posen chose unreasonable.

We finally turn to the question of whether the notice given by Posen was reasonable. Again, a reasonable jury could not find that Posen acted unreasonably. Posen had made Skyline aware of an intent to terminate in its February 2 letter. Although after that time Posen let Skyline know that the process could still move forward and Skyline submitted its second set of plans, Skyline was nevertheless on notice that Posen was reaching a decision point in the contractual relationship. The notice given on February16 could hardly have been a surprise, and Posen was not required to give advance notice or permit another opportunity for Skyline to obtain approval.

**III.**

For the foregoing reasons, we affirm the judgment of the district court.