In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3006

AL'S SERVICE CENTER, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BP PRODUCTS NORTH AMERICA, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 4508—**George M. Marovich**, *Judge*.

ARGUED FEBRUARY 9, 2010—DECIDED MARCH 26, 2010

Before POSNER, ROVNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This suit under the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 *et seq.*, pits a defunct gas station in Oakbrook Terrace (a suburb of Chicago), called Al's Service Center, against BP, the giant oil company. Al's' owner is a coplaintiff, but we need not discuss him separately.

The suit was filed almost seven years ago and has dragged on unconscionably as a result of confused law-

yering and the Job-like patience of Judge Andersen, who presided over the case until almost the end, when it was reassigned to Judge Marovich, who administered the *coup de grâce*.

The Petroleum Marketing Practices Act protects a franchised gas station from arbitrary termination by the franchisor. *Draeger Oil Co. v. Uno-Ven Co.*, 314 F.3d 299, 299-300 (7th Cir. 2002); cf. *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1097 (7th Cir. 1988); James A. Brickley, Frederick H. Dark & Michael S. Weisbach, "The Economic Effects of Franchise Termination Laws," 34 *J.L. & Econ.* 101, 110 (1991). The best theory for why such a law is needed is that "a franchised dealer in effect invests in the franchisor's trademarks and as a result creates goodwill for the franchisor which the latter might on occasion be tempted to appropriate by terminating the franchisee." *Draeger Oil Co. v. Uno-Ven Co.*, *supra*, 314 F.3d at 299. Consistent with this theory, Al's contends that BP drove it out of business so that it could open a company station on the site, though as far as we know BP has not done so.

Whether it's a sensible theory is another question; we expressed doubts in both the cases we just cited, echoing criticisms of franchise laws, such as the Petroleum Marketing Practices Act, as rank interferences with liberty of contract. Thomas M. Pitegoff, "Franchise Relationship Laws: A Minefield for Franchisors," 45 *Business Lawyer* 289, 309-10 (1989); Donald P. Horwitz & Walter P. Volpi, "Regulating the Franchise Relationship," 54 *St. John's L. Rev.* 217, 273-76 (1980). But the wisdom

of the law is not our business; all that matters is that Al's was a BP franchisee within the scope and meaning of the Act and therefore BP could neither terminate the franchise except on a ground listed in the Act nor refuse to renew the franchise relationship, if it was severed, other than on one of those grounds. 15 U.S.C. §§ 2802(a)-(c).

A franchise is a set of contracts: in the case of a gas station, a set consisting of a supply contract, a lease of premises (unless the dealer owns the premises, as it did not here), and a trademark license. None of these contracts is required to be perpetual, and when one or more expires, the franchise may be said to have expired. But the franchisee can insist on renewal of the expired contract or contracts on reasonably similar terms, and thus on the continuation of the franchise relationship, unless the franchisor has some authorized ground for nonrenewal. The reason the statute speaks of renewal of the "franchise relationship" rather than of the "franchise" is that "the PMPA contemplates that franchisors can respond to market demands by proposing new and different [contract] terms at the expiration of a franchise agreement." *Mac's Shell Service, Inc. v. Shell Oil Products Co.*, 2010 WL 693684, at *10 (U.S. Mar. 2, 2010). Hence our reference, in speaking of renewal, to "reasonably similar terms."

In 2002 Al's learned that the State of Illinois intended to condemn a small slice of the gas station's property in order to widen one of the roads that run alongside it. The widening would close off two of the five entrances to the station, although the plan was later modified so that only

one entrance would be eliminated and another one nar-
rowed. But the elimination even of just that one entrance
was bound to create a problem. The gas station was on
a corner at which a highway intersects a side street. Most
of the station's customers entered the station by one of the
two entrances from the highway and, after tanking up,
left by the other. With one of those entrances closed,
drivers entering the station from the highway would
have to either enter and leave by the same entrance,
increasing congestion and the risk of an accident, or exit
on the side street, which would deflect them from their
intended route.

In March 2003 BP notified Al's that it would terminate
the franchise 10 days before the condemnation took effect,
pursuant to the provision in the Petroleum Marketing
Practices Act that "the term 'an event which is relevant
to the franchise relationship *and as a result of which termina-
tion of the franchise or nonrenewal of the franchise relationship
is reasonable*' includes events such as . . . condemnation or
other taking, in whole or in part, of the marketing
premises pursuant to the power of eminent domain."
15 U.S.C. § 2802(c)(5) (emphasis added).

The condemnation took place on June 27, 2005. Al's'
franchise contracts (the lease, supply contract, and trade-
mark license) expired by their terms (that is, besides as a
consequence of the condemnation) the following month.
BP wrote Al's, telling it to vacate the premises because
the franchise had been terminated. Al's didn't do so—for
years. And BP continued selling it gasoline. Indeed
nothing changed in the parties' relationship until late

May and early June 2006, when, according to Al's, for a period of 12 days (eight of them consecutive, including the Memorial Day weekend), BP delivered no gasoline to Al's. BP denies that there was any interruption in delivery; the district court never resolved the dispute.

Later, in the summer of 2006, as part of the widening project, the state removed Al's' tall roadside Amoco sign. (BP had acquired Amoco in 1998. Al's had been an Amoco station and it continued to use the Amoco name after the acquisition.) Al's asked BP to replace it, and offered to pay the cost of doing so, but BP refused. (That was in October.) Al's claims that without the sign it could not break even.

It never got the sign, and abandoned the business on May 1, 2008. It seeks tens of millions of dollars in compensatory and punitive damages for what it contends were BP's illegal efforts to destroy its business. It seeks these damages under both the Petroleum Marketing Practices Act and state law, though the district court refused to allow Al's to amend its complaint to add any state-law claims.

Al's argues that BP terminated the franchise in the letter of March 2003 which said that the franchise would be terminated 10 days before the condemnation. But the condemnation did not occur for more than two years after the letter was sent, and how the *letter* could be the termination escapes us. Both Al's and BP continued to behave as if the lease remained in effect, the supply contract remained in effect, and the trademark license remained in effect—and they did remain in effect. Even

after the contracts expired, the parties behaved as if they were still in effect. Except that Al's claims that the threat of termination caused it to lose valuable employees because they were afraid they'd soon be out of work, no change of practical significance in the franchise relationship occurred until the interruption (if there was an interruption) of supply in May 2006, more than three years after the letter had been sent.

In June 2006, right after the alleged interruptions in the supply of gasoline, the district court on Al's's motion issued a preliminary injunction against BP's terminating the franchise. Nothing further of note happened until October, when BP refused to replace the sign. One might have expected Al's to ask the district court to hold BP in contempt of the preliminary injunction, which was still in effect and indeed remained so until made moot by Al's' abandonment of its business, and to impose an appropriate sanction for the contempt; for Al's believes (though mistakenly, as we'll see) that the refusal to replace the sign was an act of termination. Instead, having it seems forgotten about the injunction, Al's waited a year and then moved the district court for leave to file a fourth amended complaint, adding various claims (such as a claim for damages from the alleged supply interruptions) and additional supplemental state-law counts. The court denied leave to file the amended complaint and later granted BP's motion for summary judgment and dismissed the suit.

After entry of the final judgment against it, Al's moved the district court for reconsideration under Fed. R. Civ. P.

59 and asked to be allowed to file a sixth amended complaint (the court had allowed a fifth to be filed). The judge denied the motion, and the appeal challenges that denial as well as the denial of leave to file the fourth amended complaint, and the original judgment.

It is very difficult to understand either side's arguments. But it seems to us that the proper analysis is the following. The franchise was *not* terminated by the March 2003 letter; that is for sure. Also, it is reasonably clear, though not certain, that BP was entitled to terminate the franchise or decline to renew the franchise relationship when the condemnation occurred, even though the state took less than 2 percent of the gas station's 1.3 acres.

Whether the condemnation was an event justifying termination depends on whether any part of the "marketing premises" was taken, and, if so, whether a taking is grounds for termination even if its impact on the franchisor is trivial. The condemnation significantly degraded the marketing premises. Convenient entrances for cars and trucks are part of a gas station's marketing premises, and as we noted earlier the closing of one of only two entrances on the highway side of the gas station made the use of the station by customers less safe and convenient. That was consequence enough to entitle BP to terminate its relationship with Al's, even though the amount of land that the state took in the condemnation was only a small percentage of the entire property. The amount of land taken, whether in relative or in absolute terms, is unimportant in itself; what is important is the effect of the taking on the marketing of gasoline.

The statutory list of acts that warrant termination of a franchise relationship is prefaced by the statement that such an act must be "relevant to the franchise relationship and as a result of [the act] termination of the franchise or nonrenewal of the franchise relationship [must be] reasonable." And so it is possible to argue that condemnation or some other listed event is grounds for lawful termination only if termination would be a "reasonable" response to the event. That is the interpretation adopted by the Sixth Circuit in *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509, 1512 (6th Cir. 1989). The Third Circuit adopted it as well in *Sun Refining & Marketing Co. v. Rago*, 741 F.2d 670, 673 (3d Cir. 1984), but later backed off. See *Lugar v. Texaco, Inc.*, 755 F.2d 53, 58-59 (3d Cir. 1985). The other circuits to have addressed the issue (we have not) have rejected the Sixth Circuit's approach. *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 378 (4th Cir. 1992) (per curiam); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir. 1987); *Atlantic Richfield Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir. 1987); *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir. 1986).

There isn't much at stake in this disagreement, at least in the case of condemnation. Even without the prefatory language quoted above, it would be apparent that if the state condemned merely a strip of unused property at the back of the gas station, it would not be taking any part of the station's "marketing premises," and that if the state condemned a part of those premises so small that it couldn't possibly reduce the gas station's sales of BP gas, the invocation of the condemnation clause as

grounds for terminating the franchise relationship would be in bad faith. For the prefatory language, whether or not (probably not, as the majority of the circuits have ruled) it establishes an additional criterion that must be satisfied for termination to be permissible, indicates the spirit in which the listed events should be interpreted. That indication of spirit is important because the list is not exhaustive; other, unlisted events are allowed to justify a termination, and they have to be "reasonable" too.

So, to resume the narrative, BP could in June 2005, when the condemnation finally was ordered, have terminated its relationship with Al's. But it didn't do so. It gestured at doing so by demanding possession of the premises, but rather than following through and taking possession it acquiesced in Al's' continued possession. BP also continued supplying Al's with gasoline and allowing it to use the BP name and Amoco sign. Everything was, at least at first, as before.

A franchise, as we said, is a set of contracts. Can one or more of the contracts be implied? The definition of "contract" in the Petroleum Marketing Practices Act suggests that it can be, as we assumed in *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1217-18 (7th Cir. 1982). For "the term 'contract' means any oral or written agreement. For supply purposes, delivery levels during the same month of the previous year shall be prima facie evidence of an agreement to deliver such levels." 15 U.S.C. § 2801(10). The second sentence of the definition describes a contract implied by the parties' course of conduct. Such contracts are common and to exclude them from the scope of the Act would be arbitrary.

A typical such contract is formed when a landlord accepts rent from an overstaying tenant. Illinois law deems the lease extended by that acceptance. *Hunt v. Morton*, 18 Ill. 75 (1856); *Meyer v. Cohen*, 632 N.E.2d 22, 29 (Ill. App. 1993); *A.O. Smith Corp. v. Kaufman Grain Co.*, 596 N.E.2d 1156, 1162-63 (Ill. App. 1992); *Restatement (Second) of Property, Landlord and Tenant* § 14.4 and comment e (1977). *Brach* was such a case, and accepting rent from an overstaying tenant was what BP, the owner of the premises of Al's' gas station, did in this case.

The lease was not the only contract. There were also as we said a trademark license and a gasoline-supply contract. (The lease and the supply contract were in the same document, captioned "lease and supply contract," but analytically they are distinct.) They too were extended when BP continued to accept the payments prescribed by them. *People v. Dummer*, 113 N.E. 934, 935 (Ill. 1916); *Village of Orland Hills v. Citizens Utilities Co.*, 807 N.E.2d 590, 595-96 (Ill. App. 2004); *Hobbs v. Massasoit Whip Co.*, 33 N.E. 495 (Mass. 1893) (Holmes, J.). For the principle of the overstaying-tenant cases is general: You can't accept payment for performance without performing, when it is obvious that you are in a commercial relationship with the payor. Receipt of payment in such a context creates what is called an "implied-in-fact contract" and is treated just like an express contract. That is the significance of "in fact": the circumstances allow an inference that the parties had a deal (a "meeting of the minds") even though there was no statement to that effect. "[B]ehavior takes the place of articulate acceptance," as we put it in *Brines v. XTRA Corp.*, 304 F.3d 699, 703 (7th Cir. 2002). "[A]n

implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Lirtzman v. Fuqua Industries, Inc.*, 677 F.2d 548, 551 (7th Cir. 1982) (Illinois law); E. Allan Farnsworth, *Contracts* § 3.10, pp. 129-30 (4th ed. 2004).

The parties' relationship may have altered in May 2006, if indeed there was an interruption of supply then; and it altered in October with BP's refusal to replace the sign. A temporary interruption of supply, unless excused by *force majeure* or some other defense, would be a breach of contract entitling Al's to sue under state law. But Al's could seek a remedy under the Petroleum Marketing Practices Act only if BP had terminated the franchise, or failed to renew the franchise relationship, 15 U.S.C. §§ 2805(a), (d), and a merely temporary breach of a supply contract would not do either. As the Supreme Court said in *Mac's Shell Service, Inc. v. Shell Oil Products Co.*, *supra*, at *7, "reading the Act to prohibit simple breaches of contract . . . would be inconsistent with the Act's limited purpose and would further expand federal law into a domain traditionally reserved for the States."

In contrast, the refusal to replace the sign, as opposed to a merely temporary failure to replace it, might, as an original matter, be thought an act of "constructive" termination—an act so destructive of the franchisee's ability to operate that it would have the practical consequences of an explicit termination. *Dersch Energies, Inc. v. Shell Oil Co.*,

314 F.3d 846, 859-60 (7th Cir. 2002); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 917, 922-23 (6th Cir. 1989). The Supreme Court in its recent *Mac's Shell* opinion refused to say whether constructive termination is a proper ground for a violation of the Petroleum Marketing Practices Act, and expressed skepticism that it is. *Mac's Shell Service, Inc. v. Shell Oil Products Co., supra*, at *7 n. 8; see also *id*. at *5-9 nn. 4, 9, 11. We don't know *why* the Court is skeptical; without a doctrine of constructive termination, there would be, as in employment-discrimination law, where the closely analogous doctrine of constructive discharge is well recognized, *Pennsylvania State Police v. Suders*, 542 U.S. 129, 142-43 (2004); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007); *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998), a big loophole in the Petroleum Marketing Practices Act. But we cannot ignore the Court's ruling that "a necessary element of any constructive termination claim under the Act is that the franchisor's conduct forced an end to the franchisee's use of the franchisor's trademark, purchase of the franchisor's fuel, or occupation of the franchisor's service station." *Mac's Shell Service, Inc. v. Shell Oil Products Co., supra*, at *9. None of those things happened here. And we mustn't forget the preliminary injunction. It ordered the maintenance of the franchise relationship, and was still in force when Al's abandoned the business.

Had BP refused to comply with the injunction and engaged in acts forbidden by it that destroyed the franchise relationship, the mere existence of the injunction would be an irrelevance. But Al's never complained to the court that BP was violating the injunction, and this is

further evidence that the franchise relationship ended only when Al's abandoned its business. We conclude that BP did not violate the Petroleum Marketing Practices Act.

The district court refused to allow Al's to file a fourth and sixth amended complaint, and it was in those amended complaints that Al's sought to add supplemental state-law claims. When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims, 28 U.S.C. § 1367(c)(3); *Beck v. Dobrowski*, 559 F.3d 680, 686 (7th Cir. 2009), which the plaintiff can then prosecute in state court. The district court did that in effect by refusing to allow Al's to add supplemental state-law claims after dismissing Al's' federal claim. The court's decision was not only well within its discretion but clearly correct. Al's not only dawdled in adding state-law claims, but sketched them so cursorily in the proposed amended complaints as to give the judge no inkling of whether they might have any possible merit.

With jurisdiction over its state-law claims relinquished, Al's can continue its fight with BP in state court, though with uncertain prospects; for its state-law breach of contract claim may be barred by the contract doctrine that requires a plaintiff to mitigate his damages. *Moran Foods, Inc. v. Mid-Atlantic Market Development Co.*, 476 F.3d 436, 439-40 (7th Cir. 2007); *Fisher v. Fidelity & Deposit Co.*, 466 N.E.2d 332, 340 (Ill. App. 1984); *Restatement (Second) of Contracts* § 350 (1981); Farnsworth, *supra*, § 12.12, pp. 778-88. By failing to complain that the injunction was being

violated, Al's may have condoned the violations that it claims imposed tens of millions of dollars of losses on it. Not that the injunction *was* violated; all it says is that "BP Products North America is hereby prohibited from terminating or not renewing its franchise relationship with Al's Service Center," and there was no termination or nonrenewal. But Al's *thought* there was, so that its failure to try to enforce the injunction casts doubt on its claim to have been harmed. And although it didn't have to ask for injunctive relief in order to preserve a right to seek damages, *Wilson v. Kreusch*, 675 N.E.2d 571, 574 (Ohio App. 1996), it wasted the district court's time by obtaining an injunction that it was unwilling to take any steps to enforce.

Al's may in any event be judicially estopped to assert a breach of contract claim in state court. A litigant who prevails on one ground cannot in a subsequent case repudiate that ground in an effort to obtain a further victory. *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001); *Bidani v. Lewis*, 675 N.E.2d 647, 652 (Ill. App. 1996); *Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir. 1993); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). The purpose of the doctrine is "to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant." *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998). Al's obtained a preliminary injunction that prevented BP from terminating its franchise for five years, on the theory that BP had cancelled the contracts that constituted the franchise. It shouldn't be permitted after what is now seven years to seek damages for breach of contracts that it successfully argued had been terminated. The fact

that its success had come at a preliminary stage in the litigation is no bar to the application of the doctrine. *Bidani v. Lewis, supra*, 675 N.E.2d at 652; *Kale v. Obuchowski, supra*, 985 F.2d at 362; *United National Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779-80 (9th Cir. 2009); *Murray v. Silberstein*, 882 F.2d 61, 66-67 (3d Cir. 1989).

It is true that no matter how construed, the preliminary injunction would not have prevented the loss of gasoline sales during a period of interruption of supply or loss of valuable employees. But we can't see how BP could be thought at fault for notifying Al's that the franchise would be terminated as soon as the condemnation took place, even if an inevitable consequence was that some of Al's' employees, seeing the handwriting on the wall, sought employment elsewhere. And the loss of the gasoline sales, if there was a loss, could not have been consequential. For earlier BP had mistakenly failed to bill Al's for five months' rent—some $62,000—and there is no evidence that the alleged supply interruption cost Al's that much. And because consequential damages are not available in the usual breach of contract case, Al's' belief that it can lever its tiny loss into a multimillion damages claim is a fantasy.

Breach of contract is not the only state-law claim that Al's sought to add in its fourth and sixth amended complaints, however. The others are tort claims and include fraud, intentional interference with prospective economic advantage, violation of the Illinois Franchise Disclosure Act, 815 ILCS 705 (which however is similar to the Petroleum Marketing Practices Act), and even slander. These

seem fanciful, but their merits cannot be determined from the brief description in the complaint.

Al's can pursue further relief in the Illinois state courts if it wants, but we suspect that if it does so it will be tilting at windmills.

AFFIRMED.