In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1986

GIRL SCOUTS OF MANITOU COUNCIL, INC.,

*Plaintiff-Appellant,*

*v.*

GIRL SCOUTS OF THE UNITED STATES OF AMERICA, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08-cv-184-JPS—**J.P. Stadtmueller**, *Judge.*

ARGUED MAY 2, 2011—DECIDED MAY 31, 2011

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* This diversity suit pits a local Girl Scouts "council" ("local Girl Scouts chapter" would be a more illuminating designation), which we'll call Manitou, located in Wisconsin, against the national Girl Scouts organization. Manitou accuses the national organization of violating the Wisconsin Fair Dealership Law, Wis. Stat. ch. 135, along with Wisconsin common law principles that we can ignore.

In 2004 there were more than 300 local councils (there are nearly three million Girl Scouts), each with an exclusive territory demarcated in its charter. The local councils and the national organization are organized as nonprofit corporations. The councils are not subsidiaries of the national organization; rather, the national organization (which was founded in 1912 and incorporated in 1950 by Act of Congress, 36 U.S.C. §§ 80301 *et seq.*) relates to the councils as franchisor to franchisee. It "charters" (that is, licenses) the local councils, thereby authorizing them to sell cookies and other merchandise under the "Girl Scout" trademark, which the national organization owns. The Manitou council derives about two-thirds of its income from the sale of Girl Scout cookies and merchandise, with cookies generating the lion's share of that income. The other third comes from charitable donations, fees generated by Girl Scout camps owned and operated by the council, and investments. The local council remits to the national organization the membership fees paid by the Girl Scouts enrolled by the council, or by their parents.

The national organization decided that 300 councils were too many. It wanted to shrink the number by two-thirds. As part of the rearrangement of boundaries incident to the shrinkage (which the national organization calls "realignment"), Manitou, whose territory occupies a large irregular slice of eastern Wisconsin, was slated to be dissolved. Sixty percent of its territory would be given to a new council that would occupy much of northern Wisconsin and Michigan's Upper Peninsula and the other 40 percent would be divided between two other new councils, in southern Wisconsin.

Manitou sued to enjoin the national organization from taking away its territory (which would not put it out of business, but would preclude its representing itself as a Girl Scouts organization or otherwise using Girl Scout trademarks). It argued that it was a dealer and that the national organization's action violated Wisconsin's fair-dealership law. It sought a preliminary injunction, lost in the district court, but appealed and won in our court. 549 F.3d 1079 (7th Cir. 2007). The further proceedings in the district court resulted in the grant of summary judgment to the national organization and the denial of Manitou's motion for summary judgment, and Manitou again appeals. The preliminary injunction was dissolved when the case was dismissed, but, as far as we know, the national organization is making no attempt to implement the realignment in Wisconsin pending the outcome of this appeal.

The district judge reasoned that to apply the Wisconsin Fair Dealership Law to the national organization would violate the organization's freedom of expression, guaranteed by the First Amendment. According to its congressionally granted charter, the national organization seeks "to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity," and other virtues and (a bit redundantly) instill "the highest ideals of character, patriotism, conduct, and attainment." 36 U.S.C. §§ 80302(1), (3). We are not told exactly how it seeks to do these things but we do not understand Manitou to be denying that the national organization's activities include protected expression and that it licenses local councils such as Manitou to assist in that expressive

activity. The Supreme Court has held that the Boy Scouts are an expressive association, *Boy Scouts of America v. Dale*, 530 U.S. 640, 653-56 (2000); cf. *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573-75 (1995), and no reason is suggested for distinguishing between them and the Girl Scouts.

So Wisconsin could not, without violating the Constitution, require the national organization to promote different values in Wisconsin, or even (we may assume, without deciding) require it to admit boys to Girl Scout troops in the state. The qualities that the organization wants to instill in girls are not necessarily those that it would want to instill in boys. Boy Scouts of America emphasizes, along with virtues similar to those urged by the Girl Scouts, bravery and physical strength. "Overview of Boy Scouts of America," http://scouting.org/About/FactSheets/OverviewofBSA.aspx (visited May 15, 2011); *Boy Scouts of America v. Dale, supra*, 530 U.S. at 649; cf. *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc., supra*. But it does not follow that the First Amendment exempts the Girl Scouts from state laws of general applicability that have only a remote, hypothetical impact on the organization's message.

The original stated reasons for reducing the number of local councils were to improve the marketing of Girl Scout cookies, exploit economies of scale, and do more effective fundraising—all by increasing each surviving council's resources. But in this appeal the national organization emphasizes instead a goal of increasing the racial and ethnic diversity of the Girl Scouts. The idea seems

to be that the larger the area served by a council, the likelier it is to encompass a racially and ethnically diverse population of girls. Of course that could equally be viewed as dilution, as when legislatures redraw district lines so that a minority group that had a voting majority in some of these districts becomes a minority—in the extreme case when voting by district is replaced by state-wide voting. See *Thornburg v. Gingles*, 478 U.S. 30, 47-51 (1986). But just as the national organization of the Boy Scouts was held entitled to exclude homosexuals as scoutmasters in order to avoid blurring that organization's ideological identity, *Boy Scouts of America v. Dale*, *supra*, 530 U.S. at 653-59, so the national organization of the Girl Scouts claims a First Amendment right to reorganize its structure in an effort to attract more members of minority groups and by doing so convey a stronger message of racial and ethnic inclusiveness.

The First Amendment was barely hinted at in the first appeal of this case, and was just a small part of the national organization's argument in the district court, but when it became the district court's sole ground for ruling in its favor the national organization embraced it eagerly. Yet this ground for overriding the fair-dealership law cannot be taken seriously in the absence of any evidence of a connection between realignment of the councils and promotion of diversity—and none was presented. If the national organization wants Manitou to recruit minority girls more vigorously, it can order Manitou to do so—the national organization is authorized by its contracts (the "charters") with the local councils to impose requirements

on the councils and revoke or refuse to renew a charter if those requirements aren't met. How changing the territorial boundaries would increase the recruitment of girls from minority groups is nowhere shown.

The national organization's main articulated concern in promulgating the realignment plan was with declining membership in the Girl Scouts. It noted that the percentage of girls who belong to minority groups is increasing and is expected to soon reach half the girl population; the implication is that stepped-up recruitment efforts should be directed toward those girls to maintain membership. No doubt; but this is no more "expressive" than the decision by a fast-food chain to increase its offerings of Mexican food because the Hispanic population in the United States is growing faster than the Anglo population. Anyway it's only by picking a couple of peak years that the national organization can claim that membership in the Girl Scouts is declining. The number of Girl Scouts was higher in 2003 and 2004 (when the realignment plan was adopted) than for all years in the Girl Scouts' long history except 1964 to 1973. And as a percentage of the national girl population, Girl Scout membership was higher in 2003 and 2004 than in any years since 1973 except for the years 1991 through 1993.

The possibility that a law of general application might indirectly and unintentionally impede an organization's efforts to communicate its message effectively can't be enough to condemn the law. Otherwise the Girl Scouts could challenge building codes on the ground that they

increase the costs of building and maintaining Girl Scout camps and by doing so reduce the resources available for inculcating Girl Scout values in the girls; and media companies could claim exemption from minimum wage laws and journalists from income taxes. If the antitrust laws apply to the nonacademic activities of universities, as they do, *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98-102 (1984), though universities exist principally to speak, then franchise laws can apply to the Girl Scouts' dealership structure, which is optimized for the sale of cookies. On the record of this case it is conjecture—and implausible conjecture at that—that forbidding the national organization to dissolve the Manitou council would hamper expressive activity. There is no suggestion that the council has ever failed to implement the national organization's policies regarding membership diversity, or that it has ever, in any respect, gone off message. The national organization ignores the possibility of simply directing Manitou to bend more of its efforts toward enlisting black, Hispanic, or Asian girls in the Girl Scout troops in its territory.

The national organization argues as a backup to its First Amendment claim that dissolving Manitou would not violate the Wisconsin Fair Dealership Law. In making this argument it is going against the district court, which ruled that the national organization had indeed violated the dealership law (as also suggested by the analysis in our first decision, ordering the grant of a preliminary injunction in Manitou's favor). There is a

question whether the issue is preserved, since it is not mentioned in the list of questions presented in the national organization's brief; and it is argued casually; but we'll consider it.

The dealership statute forbids a franchisor to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Wis. Stat. § 135.03. A "dealer" is defined as the grantee of a dealership and a "dealership agreement" as an agreement that, so far as bears on this case, authorizes the grantee to "use [the grantor's] trade name, trademark, service mark, logotype, advertising or other commercial symbol" and creates "a community of interest" between the parties "in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement, or otherwise." §§ 135.02(2), (3)(a).

The national organization argues that the statute is inapplicable to nonprofit entities, such as it and the Manitou council. The reference to "commercial symbol[s]" and to "the business" of offering, etc., goods and services provides some support for the argument, since one doesn't usually think of nonprofit enterprises as being "commercial" and engaged in "business." Or didn't use to—for outweighing these hints is the fact that nonprofit enterprises frequently do engage in "commercial" or "business" activities, and certainly the Girl Scouts do. Proceeds of the sale of Girl Scout cookies are the major source of Manitou's income. The local councils sell other merchandise as well. Sales of merchandise account for

almost a fifth of the national organization's income, and most of the rest comes from membership fees and thus depends on the success of the local councils in recruiting members; that in turn depends on the councils' revenues and thus gives the national organization an indirect stake in the cookie sales. The national organization describes its reorganization of the local-council structure as "a key component" of its "Core Business Strategy." From a commercial standpoint the Girl Scouts are not readily distinguishable from Dunkin' Donuts.

No gulf separates the profit from the nonprofit sectors of the American economy. There are nonprofit hospitals and for-profit hospitals, nonprofit colleges and for-profit colleges, and, as we have just noted, nonprofit sellers of food and for-profit sellers of food. When profit and nonprofit entities compete, they are driven by competition to become similar to each other. The commercial activity of nonprofits has grown substantially in recent decades, fueled by an increasing focus on revenue maximizing by the boards of these organizations, and this growth has stimulated increased competition both among nonprofit enterprises and with for-profit ones. Howard P. Tuckman & Cyril F. Chang, "Commercial Activity, Technological Change, and Nonprofit Mission," in *The Nonprofit Sector: A Research Handbook* 629, 630 (Walter W. Powell & Richard Steinberg eds., 2d ed. 2006); Dennis R. Young & Lester M. Salamon, "Commercialization, Social Ventures, and For-Profit Competition," in *The State of Nonprofit America* 423, 436-37 (Salamon ed. 2002); Burton A. Weisbrod, "The Nonprofit Mission and Its Financing,"

in *To Profit or Not to Profit: The Commercial Transformation of the Nonprofit Sector* 1, 16-17 (Weisbrod ed. 1998); Michael S. Knoll, "The UBIT: Leveling an Uneven Playing Field or Tilting a Level One?," 76 *Fordham L. Rev.* 857, 858-59 (2007); Evelyn Brody, "Agents Without Principals: The Economic Convergence of the Nonprofit and For-Profit Organizational Forms," 40 *N.Y. Law School L. Rev.* 457, 489-90 (1996).

The principal difference between the two types of firm is not that nonprofits eschew typical commercial activities such as the sale of services—they do not—but that a nonprofit enterprise is forbidden to distribute any surplus of revenues over expenses as dividends or other income to owners of the enterprise, but must apply the surplus to the enterprise's mission. That does not seem to alter the incentives of the people who run such organizations much, if one may judge from the many scandals involving nonprofit colleges and universities, which seem to compete for students, faculties, research grants, and alumni gifts with a zeal comparable to that of their for-profit counterparts. "In response to the challenges they are facing from the market, nonprofits are internalizing the culture and techniques of market organizations and making them their own." Young & Salamon, *supra*, at 436. We have noted that the original stated purpose of the national Girl Scout organization in cutting its local councils by two-thirds was to effectuate a cost- and revenue-driven "business strategy," which is a worthy objective but no different from the objectives of profit-making firms. It has even been said with regard to a previous restructuring

of the Girl Scouts of America that "lurking in the background like a corporate raider was the Boy Scouts of America. It had launched a feasibility study of extending its membership to girls." John A. Byrne, "Profiting From the Nonprofits," *Business Week*, March 16, 1990, pp. 66, 72.

The principal or at least the most readily defensible objective of dealer protection laws is to prevent franchisors from appropriating good will created by their dealers. *Al's Service Center v. BP Products North America, Inc.*, 599 F.3d 720, 722 (7th Cir. 2010); *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1097 (7th Cir. 1988) (discussing the Wisconsin law); *Veracka v. Shell Oil Co.*, 655 F.2d 445, 448 (1st Cir. 1981); Paul Steinberg & Gerald Lescatre, "Beguiling Heresy: Regulating the Franchise Relationship," 109 *Penn St. L. Rev.* 105, 221-23 (2004); James A. Brickley, Frederick H. Dark & Michael S. Weisbach, "The Economic Effects of Franchise Termination Laws," 34 *J.L. & Econ.* 101, 110 (1991); Martin D. Fern & Philip Ian Klein, "Restrictions on Termination and Nonrenewal of Franchises: A Policy Analysis," 36 *Bus. Law.* 1041, 1042 (1981). Suppose a franchisor has given a franchisee an exclusive territory in order to encourage him to promote the franchisor's brand, knowing that if there were multiple, competing franchisees in that territory none would have an incentive to invest in the brand because other franchisees would free ride on his efforts. And suppose that after an exclusive franchisee's promotional efforts have made the franchisor's brand popular, so that the franchisee's promotion of the brand is no longer important to its success, the franchisor decides to seed the franchisee's

territory with additional franchisees in order to create intrabrand competition, which would lower the retail price of the branded good (thus squeezing the franchisees' margins) and so further expand demand for the brand and therefore total sales. This would be an example of a franchisor's acting to expropriate good will for his brand that had been created by the franchisees' efforts.

Dealer protection laws are aimed at such abuses, though they also and perhaps predominantly reflect the political influence of local businessmen seeking advantages over franchisors likely to be located in other states. Brickley, Dark & Weisbach, *supra*, at 115-17; Donald P. Horwitz & Walter M. Volpi, "Regulating the Franchise Relationship," 54 *St. John's L. Rev.* 217, 275-76 (1980); cf. *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 63 (Wis. 1981). Either way the concerns that motivate the laws seem applicable to nonprofit enterprises that enter into dealership agreements as defined in the laws, and so, as in our previous opinion, we decline to read an exception for nonprofit enterprises into the Wisconsin law. 549 F.3d at 1092-94. Indeed, the statement in *Foerster, Inc. v. Atlas Metal Parts Co., supra*, 313 N.W.2d at 63, that the dealership law "was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or 'good will' as part of their association with the grantor of the dealership" could have been written with the Manitou Council in mind. It manages a rolling inventory of Girl Scout-branded cookies, operates camps that are identified as "Girl Scout camps," and proselytizes for

Girl Scouting in the communities that it serves, building up good will both for the local council and the national brand.

The national organization next argues that its alteration of Manitou's territory did not change "the competitive circumstances of [the] dealership agreement," a term we understand to mean provisions of the agreement that affect the dealer's competitive position; stripping a dealer of territorial exclusivity granted in the dealership agreement would be an example of such a change. Of course if the grant of exclusivity has an exception, the franchisor does not change the competitive circumstances of the dealership *agreement* by availing itself of the exception. And thus if the agreement authorizes the franchisor to open new stores in a franchisee's area, the franchisor can do so without thereby violating the fair-dealership law. *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 431 N.W.2d 721, 725 (Wis. App. 1988); see also *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879-83 (7th Cir. 2000) (Illinois law); *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315-17 (11th Cir. 1999) (Florida law); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 484 (5th Cir. 1984) (Louisiana law). We noted in the previous appeal that Manitou's "charter" (that is, the agreement between it and the national organization) authorized the national organization to change Manitou's territory only during the period in which it was applying for its charter (or an extension), and not after the application was granted, as it was, for the territory that the national organization now wants to eliminate. 549 F.3d at 1097-98. But the local councils

have agreed to abide by requirements promulgated by the national organization's board of directors—and among those requirements is that "in all matters concerning jurisdictional lines, the [board] has the authority to make the final decision, either during the term of the charter or upon issuance of a new charter."

Altering a franchisee's territorial boundaries can have the same effect as opening new stores in his territory; the narrower those boundaries, the less protection the franchisee has against competition from other franchisees. But when as in this case the franchisor, though authorized to alter boundaries, attempts to use that authority to terminate the franchise altogether, he runs up against the provision of the Wisconsin act that requires "good cause" to cancel a dealership. Wis. Stat. § 135.03.

The term is defined (so far as relates to this case) as the dealer's "failure . . . to comply substantially with essential and reasonable requirements imposed . . . by the grantor" of the dealership. Wis. Stat. § 135.02(4)(a). But no crisp test has emerged from the only Wisconsin decision to discuss the statutory provision. *Ziegler Co. v. Rexnord, Inc.*, 433 N.W.2d 8, 11-13 (Wis. 1988). The court did say that "the need for change sought by a grantor must be objectively ascertainable." *Id.* at 13; see *Morley-Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 377-78 (7th Cir. 1998). But the difficult question is not verification, but "need." What does it mean?

In a wide-ranging discussion of dealer protection laws, the Second Circuit said that the franchisor need not prove that his existing territorial allocations were "unprofitable": "A seller of goods in the marketplace is justified

in identifying untapped opportunities or unutilized potential and adjusting its distribution network to realize greater profits . . . . In the case at hand [the franchisor] determined it could increase sales by increasing service frequency. This result it thought best accomplished by rationalizing its distributors' haphazard routes . . . . Here we are faced with a legitimate business need to increase sales and the steps taken to further that goal. [The franchisor's] goal of increasing sales constitutes 'good cause' within the meaning of the Franchise Act. Thus, the Act does not prevent defendant from realigning plaintiffs' territories." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1185 (2d Cir. 1995). We don't know whether the Wisconsin courts would whittle down the requirement of good cause to this extent, especially in a case in which, because his *entire* territory will be transferred to other dealers, the dealer will be terminated. (The district judge correctly described the transfer as amounting to "constructive termination" of Manitou's dealership.) Even if the Wisconsin courts would go that far, the national organization's proof of good faith would fail. In this court it has all but abandoned the argument that eliminating Manitou is necessitated by business reasons, though it might well be, because the overall plan for Wisconsin is to reduce the number of local councils from fifteen to three, in part to reduce overhead costs, which though borne by the local council affect the national organization indirectly. Instead it pitches its good-cause argument on the proposition that realignment is necessary to its expressive activity—so we are back to the First Amendment, here used to get around having to

offer evidence of good cause by being proposed as a ground for narrowing the scope of a statute.

The idea of construing statutes in a strained fashion in order to avoid constitutional questions is orthodox, see, e.g., *Clark v. Martinez*, 543 U.S. 371, 380-82 (2005); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring); *Nelson v. Miller*, 570 F.3d 868, 889 and n. 13 (7th Cir. 2009); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 176-77 (4th Cir. 2010), though premised on a fictitious proposition—"that Congress did not intend the alternative [statutory interpretation that] raises serious constitutional doubts," *Clark v. Martinez*, *supra*, 543 U.S. at 381—and forcefully criticized as an "activist" doctrine because its effect is to expand constitutional prohibitions past their actual boundaries. Frank H. Easterbrook, "Do Liberals and Conservatives Differ in Judicial Activism?," 73 *U. Colo. L. Rev.* 1401, 1405-09 (2002). (In principle the legislature can eliminate the prohibition by amending the statute, but legislatures are structured to make it difficult to pass laws, and amendments are laws.) No matter; the weakness of the constitutional argument made by the national organization infects its statutory argument. There is no evidence that the proposed redrawing of boundaries is "essential" or even helpful to the attainment of the national organization's expressive goals. The purpose of the realignment remains an enigma; like many corporate and governmental reorganizations it may reflect internal bureaucratic pressures unrelated to the organization's professed legitimate concerns.

That completes our analysis, except to note certain unprofessional features of the brief filed in this court by the law firm of Hogan Lovells US LLP on behalf of the national organization.

For the proposition that "an expressive group's message and structure are critically linked," the brief cites *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989). That case involved a First Amendment challenge to a California statute that forbade the official governing bodies of political parties to endorse or oppose candidates in primary elections. The statute also dictated the organization and composition of those governing bodies, limited the term of office of the chairman of a party's state central committee, and required that the chairmanship rotate between residents of northern and southern California. The resemblance of that case to the present one is tenuous, to say the least, but without telling the reader what the case is about or that it involves political parties, the national organization's brief misleadingly states: "restrictions which limit a group's 'discretion in how to organize itself [and] conduct its affairs . . . may also color the [group's] message and interfere with [its] decisions as to the best means to promote that message,'" quoting 489 U.S. at 231 and n. 21.

Here is what the Supreme Court actually said:

> Each restriction thus limits a political party's discretion in how to organize itself, conduct its affairs, and select its leaders. Indeed, the associational rights at stake are much stronger than those we credited in *Tashjian*. There, we found that a party's right to free association embraces a right to allow registered voters who

are not party members to vote in the party's primary. Here, party members do not seek to associate with nonparty members, but only with one another in freely choosing their party leaders.[21]

[21] By regulating the identity of the parties' leaders, the challenged statutes may also color the parties' message and interfere with the parties' decisions as to the best means to promote that message.

*Id*. at 230-31 and n. 21. The Court was not talking about groups in general, but about political parties; the law firm's decision to substitute "group" for "party" in the brief was inexcusable. Furthermore, the Court did not say that restrictions that limit a political party's discretion concerning how to organize itself and conduct its affairs may also color the parties' message and interfere with the parties' decisions on how best to promote that message. It said that "by regulating the identity of the parties' leaders"—a regulation that has no counterpart in this case—the challenged statute might color the parties' message and interfere with their decisions. The brief distorts the Court's meaning, and this could not be accidental.

The brief also states that "the District Court granted [the national organization's] motion for summary judgment on all counts." That is literally correct but misleading. The court ruled that the national organization *had* violated the Wisconsin Fair Dealership Law, but that this didn't matter because the law could not constitutionally be applied to the national organization's action.

To conclude, Manitou's motion for summary judgment on its claim under the fair-dealership law should have been granted, for there is no legal or factual basis for the national organization's contrary position. The judgment granting summary judgment in favor of the national organization is therefore reversed with directions to grant summary judgment for Manitou on its fair-dealership claim and order appropriate relief; in the meantime the district judge shall reinstate the preliminary injunction. His rejection of Manitou's common law claims is, however, affirmed.

AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED.